IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Robert E. Blackburn

Civil Action No. 21-cv-01066-REB

L.J.,

    Plaintiff,

v.

KILOLO KIJAKAZI, Acting Commissioner of Social Security,

    Defendant.

## ORDER AFFIRMING COMMISSIONER

**Blackburn, J.**

    The matter before me is plaintiff's **Complaint** [#1],[1] filed April 16, 2021, seeking review of the Acting Commissioner's decision denying plaintiff's claims for disability insurance benefits and supplemental security income benefits under Titles II and XVI of the Social Security Act, 42 U.S.C. § 401, *et seq.* I have jurisdiction to review the Acting Commissioner's final decision under 42 U.S.C. § 405(g). The matter has been fully briefed, obviating the need for oral argument. I affirm.

## I. FACTUAL AND PROCEDURAL BACKGROUND

    Plaintiff alleges she is disabled as a result of chronic obstructive pulmonary disease, alcohol use disorder, and seizure disorder. After her applications for disability insurance benefits and supplemental security income benefits were denied, plaintiff requested a hearing before an administrative law judge. This hearing was held on

---

[1] "[#1]" is an example of the convention I use to identify the docket number assigned to a specific paper by the court's case management and electronic case filing system (CM/ECF). I use this convention throughout this order.

September 22, 2020.  At the time of the hearing, plaintiff was 58 years old.  She has a college degree and past relevant work experience as sales clerk.  She did not engage in substantial gainful activity during the relevant period between May 1, 2018, her alleged date of onset, and December 31, 2018, her date last insured.

The ALJ found plaintiff was not disabled and therefore not entitled to disability insurance benefits or supplemental security income benefits.  Although the medical evidence established plaintiff suffered from severe impairments, the judge found the severity of those impairments did not meet or equal any impairment listed in the social security regulations.  The ALJ determined plaintiff had the residual functional capacity to perform a range of medium work with certain postural, environmental, and cognitive limitations.  As this conclusion did not preclude plaintiff's past relevant work as a sales clerk, the ALJ found her not disabled at step four of the sequential evaluation.  Alternatively, the ALJ found at step five that there were other jobs existing in significant numbers in the local and national economies which plaintiff could perform given her residual functional capacity. Plaintiff appealed this decision to the Appeals Council.  The Council affirmed.  Plaintiff then filed this action in federal court.

## II.  STANDARD OF REVIEW

A person is disabled within the meaning of the Social Security Act only if her physical and/or mental impairments preclude her from performing both her previous work and any other "substantial gainful work which exists in the national economy."  42 U.S.C. § 423(d)(2).  "When a claimant has one or more severe impairments the Social Security [Act] requires the [Acting Commissioner] to consider the combined effects of the impairments in making a disability determination."  **Campbell v. Bowen**, 822 F.2d

1518, 1521 (10th Cir. 1987) (citing 42 U.S.C. § 423(d)(2)(C)).  However, the mere existence of a severe impairment or combination of impairments does not require a finding that an individual is disabled within the meaning of the Social Security Act.  To be disabling, the claimant's condition must be so functionally limiting as to preclude any substantial gainful activity for at least twelve consecutive months.  ***See Kelley v. Chater,*** 62 F.3d 335, 338 (10th Cir. 1995).

The Acting Commissioner has established a quinquepartite sequential evaluation process for determining whether a claimant is disabled:

1. The ALJ must first ascertain whether the claimant is engaged in substantial gainful activity.  A claimant who is working is not disabled regardless of the medical findings.

2. The ALJ must then determine whether the claimed impairment is "severe."  A "severe impairment" must significantly limit the claimant's physical or mental ability to do basic work activities.

3. The ALJ must then determine if the impairment meets or equals in severity certain impairments described in Appendix 1 of the regulations.

4. If the claimant's impairment does not meet or equal a listed impairment, the ALJ must determine whether the claimant can perform her past work despite any limitations.

5. If the claimant does not have the residual functional capacity to perform her past work, the ALJ must decide whether the claimant can perform any other gainful and substantial work in the economy.  This determination is made on the basis of the claimant's age, education, work experience, and residual functional capacity.

20 C.F.R. § 404.1520(a)(4)(i)-(v).[2]  **See also Williams v. Bowen** 844 F.2d 748, 750-52 (10th Cir. 1988).  The claimant has the initial burden of establishing a disability in the first four steps of this analysis.  **Bowen v. Yuckert**, 482 U.S. 137, 146 n.5, 107 S.Ct. 2287, 2294 n.5, 96 L.Ed.2d 119 (1987).  The burden then shifts to the Acting Commissioner to show the claimant is capable of performing work in the national economy.  **Id.**  A finding that the claimant is disabled or not disabled at any point in the five-step review is conclusive and terminates the analysis.  **Casias v. Secretary of Health & Human Services**, 933 F.2d 799, 801 (10th Cir. 1991).

Review of the Acting Commissioner's disability decision is limited to determining whether the ALJ applied the correct legal standard and whether the decision is supported by substantial evidence.  **Hamilton v. Secretary of Health and Human Services**, 961 F.2d 1495, 1497-98 (10th Cir. 1992); **Brown v. Sullivan**, 912 F.2d 1194, 1196 (10th Cir. 1990).  Substantial evidence is evidence a reasonable mind would accept as adequate to support a conclusion.  **Brown**, 912 F.2d at 1196.  It requires more than a scintilla but less than a preponderance of the evidence.  **Hedstrom v. Sullivan**, 783 F.Supp. 553, 556 (D. Colo. 1992).  "Evidence is not substantial if it is overwhelmed by other evidence in the record or constitutes mere conclusion."  **Musgrave v. Sullivan**, 966 F.2d 1371, 1374 (10th Cir. 1992).  Further, "if the ALJ failed to apply the correct legal test, there is a ground for reversal apart from a lack of substantial evidence."  **Thompson v. Sullivan**, 987 F.2d 1482, 1487 (10th Cir. 1993).

---

[2] Throughout this opinion, I cite to relevant sections of Part 404 of Title 20 of the Code of Federal Regulations, which contain the Acting Commissioner's regulations relating to disability insurance benefits. Identical, parallel regulations can be found in Part 416 of that same title, relating to supplemental security income benefits.

Although a reviewing court should meticulously examine the record, it may not reweigh the evidence or substitute its discretion for that of the Acting Commissioner. *Id.*

### III.  LEGAL ANALYSIS

By this appeal, plaintiff presents both a constitutional challenge and a substantive challenge.  As neither argument warrants remand in this instance, I affirm.

Plaintiff's constitutional argument is premised on the contention that because statutory limits on the President's ability to remove the Commissioner of Social Security violate constitutional separation-of-powers principles, the ALJ lacked authority to render a decision on plaintiff's claim for benefits.  However, although plaintiff raised this issue before the Appeals Council (*see* Tr. 2, 317-318),[3] it was not preserved in her complaint to this court.  She thus has waived the issue.  **See United States v. Olano**, 507 U.S. 725, 733, 113 S.Ct. 1770, 1777, 123 L.Ed.2d 508 (1993) ("[W]aiver is the intentional relinquishment or abandonment of a known right.") (citation and internal quotation marks omitted).

The requirements of Rule 8 of the Federal Rules of Civil Procedure are not daunting, but they still obligate a plaintiff to set forth a "short and plain statement of the claim showing that the pleader is entitled to relief." **FED. R. CIV.** P. 8(a)(2).  Accordingly,

> to state a claim in federal court, a complaint must explain
> what each defendant did to him or her; when the defendant
> did it; how the defendant's action harmed him or her; and
> what specific legal right the plaintiff believes the defendant
> violated.  After all, these are, very basically put, the elements
> that enable the legal system to get weaving – permitting the

---

[3] I use the verb "raise" here liberally, as plaintiff's argument consisted of but a single sentence challenging the ALJ's authority to adjudicate the claim under **Seila Law v. Consumer Financial Protection Board**, – U.S. –, 140 S.Ct. 2183, 207 L.Ed.2d 494 (2020).

> defendant sufficient notice to begin preparing its defense
> and the court sufficient clarity to adjudicate the merits.

***Nascious v. Two Unknown B.I.C.E. Agents***, 492 F.3d 1158, 1163 (10th Cir. 2007). ***See also Polovino v. International Brotherhood of Electrical Workers, AFL-CIO***, 2015 WL 4716543 at *4 (N.D. Okla. Aug. 7, 2015) ("[A]t a bare minimum, in addition to sufficient factual allegations, . . . a complaint must specify the legal basis for any claim."). Plaintiff's failure to assert this claim in her complaint violated these precepts and failed to give the Acting Commissioner the notice of plaintiff's claims on appeal to which she was entitled. Raising the issue for the first time in briefing is insufficient to preserve it for this court's consideration. ***See Shannon R. v. Commissioner of Social Security***, 2021 WL 5371394 at *6-*7 (W.D. Wash. Nov. 18, 2021).

Yet even if the constitutional claim were not procedurally barred, it fails substantively. Plaintiff's argument is premised on two recent Supreme Court decisions, ***Seila Law v. Consumer Financial Protection Board***, – U.S. –, 140 S.Ct. 2183, 207 L.Ed.2d 494 (2020), and ***Collins v. Yellen***, – U.S. –, 141 S. Ct. 1761, 1784, 210 L.Ed.2d 432 (2021). In these decisions, the Court held that statutory limitations on the President's ability to remove the heads of the challenged agencies (in ***Seila Law***, the Consumer Financial Protection Board; in ***Collins***, the Federal Housing Finance Authority) violated Article II separation-of-powers principles.[4] ***Seila Law***, 140 S.Ct. at 2204; ***Collins***, 141 S.Ct. at 1784. Because the Social Security Administration likewise

---

[4] Because the executive power under Article II of the Constitution belongs wholly and exclusively to the President, he retains ultimate responsibility for its use by any inferior officers to whom he delegates that power. Limitations on the President's authority to remove inferior officers exercising such delegated authority impermissibly interfere with his "active obligation to supervise" those officers. ***Seila Law***, 140 S. Ct. at 2203 (citation and internal quotation marks omitted).

is an Executive Branch agency headed by a single individual removable "only pursuant to a finding by the President of neglect of duty or malfeasance in office," 42 U.S.C. § 902(a)(3), plaintiff concludes these protections also are unconstitutional.

No one disagrees. The Acting Commissioner here concedes the point. (**Def. Resp. Br.** at 6.) The Department of Justice has so concluded. *See Constitutionality of the Commissioner of Social Security's Tenure Protection*, 45 Op. O.L.C – (Slip Op. at 10-15) (July 8, 2021) [hereinafter "DOJ Opinion"] (available at: https://www.justice.gov/olc) (last accessed: December 15, 2021). District courts likewise concur. *See* **Hutchens v. Kijakazi**, 2021 WL 5834409 at *6 (M.D.N.C. Dec. 9, 2021); **Shannon R.**, 2021 WL 5371394 at *7. Most dramatically, the current Administration acknowledged the validity of the argument by removing the then-extant Commissioner without cause.[5] (***See*** Jim Tankersley, *President Biden fired the head of the Social Security Administration*, NEW YORK TIMES (July 9, 2021) (available at: https://www.nytimes.com/2021/07/09/us/politics/biden-social-security-andrew-saul-fired.html) (last accessed: December 15, 2021).

Despite this consensus, plaintiff is not perforce entitled to a remand for a new hearing because "the unlawfulness of the removal provision does not strip the [Commissioner] of the power to undertake the other responsibilities of his office." **Collins**, 141 S. Ct. at 1788 n.23. Because plaintiff has neither argued nor demonstrated a constitutional defect in the way in which the quondam Commissioner was appointed, the actions he took while in office (and those of the ALJs who exercised

---

[5] Plaintiff does not explain why she believes "the constitutional defect . . . could have been avoided if [quondam Commissioner Andrew] Saul had simply stepped down in the wake of *Seila Law*" (**Plf. Br.** at 20), whereas his removal by the President does not accomplish that result.

his delegated authority to issue disability decisions) are not void.  *Id.* at 1787. Accordingly, plaintiff is not entitled to relief unless she can show the unconstitutional removal provision itself caused her compensable harm.  *Id.* at 1788-89.

Plaintiff has not even acknowledged her burden in this regard, much less attempted to satisfy it.  For this reason, her constitutional arguments do not warrant remand for further hearing.[6]  Having so concluded, I turn to plaintiff's argument regarding the substance of the disability decision itself.

In a single point of error, plaintiff contends the ALJ erred by not affording proper weight to the opinion of her treating neurologist, Dr. Joshua Renkin.  Plaintiff acknowledges the regulations which once required the ALJ to weigh medical source opinions and to give controlling weight to treating source opinions have been rescinded and do not apply to claims, like hers, filed after March 27, 2017.  *See* 20 C.F.R. § 404.1520c(a).  Nevertheless, she insists the ALJ erred by failing to consider or afford weight to her treating relationship with Dr. Renkin, his specialization in neurology, and the frequency of treatment she received from him.

This argument misconstrues the nature of the ALJ's responsibilities to consider the evidence under the new regulations.  No longer is there a hierarchy of opinions based on a source's treating relationship with the plaintiff; instead, all medical opinions are evaluated for their ultimate persuasiveness.  *Id.*  Although the ALJ may consider the nature of a medical source's area of specialization and relationship to the plaintiff, as

---

[6] Given this failure, I do not address the Acting Commissioner's further argument suggesting plaintiff could not show compensable harm under any circumstances because a prior Acting Commissioner ratified the appointments of all then-existing ALJs, including the ALJ who issued the decision in plaintiff's case, in mid-2018.

well as other factors, *see id.*, § 404.1520c(c)(3)-(5), the two most important factors are how well the medical source supports and explains his statements and whether the opinion is consistent with other medical and nonmedical evidence in the record, *id.*, §§ 404.1520c(b)(2) & (c)(1)-(2). Most relevantly for present purposes, although the ALJ must explain how she considered the paramount supportability and consistency factors in assessing the persuasiveness of a medical opinion, she is not required to explain how she considered any other factor unless there are two equally persuasive opinions on the issue. *Id.*, §§ 404.1520c(b)(2) & (3). Plaintiff does not suggest such is the case here, and thus the ALJ did not err by failing to specifically address these additional considerations.

Moreover, the ALJ's consideration and discussion of the supportability and consistency factors is supported by substantial evidence. The ALJ fully recounted the history of plaintiff's treatment with Dr. Renkin and found it failed to provide support for the extreme limitations endorsed in his medical source statements. (Tr. 22-23, 25.) That assessment is borne out by the record.

In May 2018, plaintiff was admitted to the emergency room after experiencing a seizure. She was started on Keppra and referred to Dr. Renkin for follow-up. (Tr. 322-325.) Although a CT scan and MRI were unremarkable (Tr. 378), an EEG showed abnormal activity that could predispose her to seizures (Tr. 418). At a follow-up appointment, plaintiff's primary care physician noted that "all providers who have seen her so far think that her seizures are alcohol related and have told her that she must stop drinking forever." Plaintiff reportedly agreed to that plan. (Tr. 443.) Two days

later, plaintiff's husband called Dr. Renkin's office, noting that plaintiff was still having "staring spells," and while her episodes had decreased in intensity, they had not completely resolved. Dr. Renkin approved a gradual increase in plaintiff's dose of Keppra. (Tr. 476.)

During her first office appointment with Dr. Renkin in June, plaintiff reported she had not had any "big seizures" and that her blackout spells had improved, although she felt sleepy and "stupid" and reported lashing out at her husband. Dr. Renkin noted that Keppra could aggravate these problems and endorsed a plan for adjusting her medications. (Tr. 473-474.) A few weeks later, Dr. Renkin again adjusted plaintiff's medications when her husband reported she seemed to be having more frequent episodes of wandering thoughts and rambling "monologues." (Tr. 473.)

When plaintiff next saw Dr. Renkin in August 2018, she reported the increased dosage of Keppra had resolved these issues. Although plaintiff was still fatigued and edgy, she reported "no events at all" over the preceding 3 months and felt she was "doing well." Dr. Renkin cleared her to drive, with caution, and set out a plan for furthering tapering her off Keppra. (Tr. 471.) In September, however, plaintiff called seeking an appointment, reporting that she was having smaller, more frequent seizures. (Tr. 470.) Dr. Renkin adjusted her medication regimen again. (Tr. 468.) However, at her November appointment, Dr. Renkin noted the side effects plaintiff was experiencing were related to her continuing use of alcohol rather than the medications and advised her to abstain from alcohol completely. (Tr. 465-466.)

When plaintiff next saw Dr. Renkin on March 28, 2019, shortly after her date last insured, she reported no significant overt seizures and was judged to be "doing well with

good control of her seizures." (Tr. 596.) Nevertheless, only a few days later, Dr. Renkin completed a medical assessment form endorsing extreme limitations in plaintiff's ability to perform every aspect of mental work-related functioning and suggesting she would be absent from work more than four days per month due to these impairments. (Tr. 663-665.) Similarly, although plaintiff reported in March 2020 that she was doing well despite occasional "mini events," during which "she will stare off into space and seems less responsive for a few seconds and then it resolves" (Tr. 814), just one month later, Dr. Renkin suggested plaintiff still experienced "events/seizures" lasting five minutes with 20 minutes of postictal confusion and could be expected to miss at least two days a month of work as a result (Tr. 820-822).[7]

Given these rather glaring discrepancies, the ALJ did not err in concluding that Dr. Renkin's opinions were not supported by the medical evidence reflected in his own treatment notes. Nor did she err in finding the extreme limitations noted in Dr. Renkin's statements inconsistent with the facts that plaintiff had flown by herself to Illinois to visit family and was looking for work during the period of her alleged disability. (Tr. 25, 60, 62-63.) Having thus found Dr. Renkin's opinions not persuasive based on the two most critical factors the regulations require her to consider, the ALJ was not obligated to factor Dr. Renkin's specialization or his treatment relationship with plaintiff into her analysis at all, much less address it in her decision.

Nor was the ALJ required to accept Dr. Renkin's suggested limitations simply because his putatively was the only medical opinion addressing plaintiff's seizure

---

[7] Despite plaintiff's suggestion to the contrary, Dr. Renkin did not assess her physical abilities to sit, stand, and walk or her ability to tolerate work-related stress. (*See* Tr. 821.)

disorder.[8]  "Although the ALJ's [residual functional capacity] determination must be grounded in some medical evidence, it ultimately is an administrative determination reserved to the Commissioner." ***Zagorianakos v. Colvin***, 81 F.Supp.3d 1036, 1044 n.10 (D. Colo. Feb. 25, 2015) (internal citations omitted).  ***See also*** 20 C.F.R. § 404.1546(c); ***Rutledge v. Apfel***, 230 F.3d 1172, 1175 (10th Cir. 2000).  The ALJ thus is "not required to adopt or rely on any medical source opinion in making her residual functional capacity assessment[.]"  ***Lumpkin v. Colvin***, 112 F.Supp.3d 1169, 1172 (D. Colo. 2015) (citation, internal quotation marks, and alteration omitted).  ***See also Moses v. Astrue***, 2012 WL 1326672 at *5 (D. Colo. Apr. 17, 2012) ("Although the opinion must be based on all the evidence of record, including the available medical evidence, the ALJ need not adopt any particular medical or other source opinion on that matter.").

For these reasons, the Acting Commissioner's disability determination must be affirmed.

## IV.  ORDERS

**THEREFORE IT IS ORDERED** that the conclusion of the Acting Commissioner through the Administrative Law Judge that plaintiff was not disabled is affirmed.

Dated December 28, 2021, at Denver, Colorado.

BY THE COURT:

Bob Blackburn
Robert E. Blackburn
United States District Judge

---

[8]  In fact, the evidence here did include a contrary medical opinion from a state agency consultant (Tr. 99, 810), which the ALJ specifically referenced in adopting limitations on plaintiff's ability to climb stairs, ramps, and ladders and work around unprotected heights and dangerous machinery (Tr. 20, 24).